UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                               )
HEARTWOOD, INC., et al.,       )
                               )
            Plaintiffs,        )
                               )
      v.                       )        Civil Action No. 02-1898 (RWR)
                               )
UNITED STATES FOREST SERVICE,  )
                               )
            Defendant.         )
_____)
```

MEMORANDUM OPINION

Plaintiffs Mark Donham and Heartwood, Inc. sued the United States Forest Service ("USFS") to compel the release of draft chapters of an ecological assessment under the Freedom of Information Act ("FOIA") and the Federal Advisory Committee Act ("FACA") after the USFS denied their initial request for the drafts.  The USFS moved for summary judgment on both the FOIA and the FACA requests.  In response, plaintiffs Heartwood and Donham filed a cross-motion for summary judgment.  Because the drafts were developed by the Hoosier-Shawnee Ecological Analysis Committee ("HSEAC"), an advisory committee subject to the FACA, and are not exempt from the FOIA, plaintiffs' cross-motion for summary judgment will be granted, and defendant's motion for summary judgment will be denied.

-2-

BACKGROUND

Donham is a full-time employee of Heartwood, a non-profit corporation that seeks to protect forests in the Central Hardwood region of the United States.  On behalf of Heartwood, Donham filed a FOIA request with the USFS, seeking copies of the "individual draft reports" of the ecological assessment for the area encompassing the Shawnee and Hooiser National Forests that the HSEAC had prepared for the USFS. (Def.'s Summ. J. Mot., Morgan Decl. ¶ 5.)  An ecological assessment is a "scientific assessment of the characteristic composition, structure and processes of ecosystems."  (Am. Compl. at 3.)  An ecological assessment is not a policy decision, a draft of a policy document, or a policy recommendation.  (Pls.' Mot. to Expedite, Ex. A at 5, 8, 9.)

The USFS initiated the ecological assessment of the Shawnee and Hooiser National Forests in order "to gain an understanding of current conditions and trends regarding the land, resources, and people [in the] relevant historical context."  (Pls.' Mot. to Expedite, Ex. A at 8.)  "A charter for the Hoosier-Shawnee Ecological Assessment, established by the supervisors of the Hoosier and Shawnee National Forests, identified a team to conduct the assessment as well as tentative questions to answer."

-3-

(Id., Ex. A at 9; see also Pls.' Summ. J. Mot., Ex. A.)  This
team, the HSEAC, was comprised of scientists, most of whom were
not employees of the USFS or the federal government.  (Pls.'
Summ. J. Mot. at 1; Def.'s Summ. J. Mot., Morgan Decl. ¶ 6.)  The
USFS entered into agreements with the scientists to produce
reports summarizing existing data.  (Def.'s Summ. J. Mot.,
Reynolds Decl. ¶ 6, Thompson Decl. ¶ 5.)  Among those on the
committee were individuals from Purdue University, Southern
Illinois University, Indiana Department of Natural Resources, The
Nature Conservancy of Indiana and the North Central Experiment
Station.  (Am. Compl. at 3.)

The USFS asked the HSEAC to produce draft reports
"summarizing [the best available] scientific information
concerning the ecological conditions of the region encompassing
the Hoosier and Shawnee."  (Def.'s Summ. J. Mot., Reynolds Decl.
¶ 7.)  Although each scientist was to work independently or in a
small group, the HSEAC had two meetings with the USFS at which
all of the scientists provided information on existing data
collections that would be used in the assessment.  (Id. ¶ 8.)
The group discussed the topics and outlined the report.  (Id.)
The USFS told the scientists not to make recommendations in their
reports (id.), and that "the results of the ecological analysis
and population viability assessments, and other analysis . . .

-4-

will be examined to determine how, or if, the desired future
conditions outlined in the existing forest plans need to be
modified." (Pls.' Summ. J. Mot., Ex. A at 2.)

The requested records consist of six documents containing
282 pages. (Def.'s Summ. J. Mot., Morgan Decl. ¶ 10.) The first
document, a draft of a chapter submitted by five scientists
unaffiliated with the USFS, summarizes information on the
diversity of aquatic life in the Shawnee and Hoosier Forests.
(Id. ¶ 11.) The second document was written by two scientists
unaffiliated with the USFS and it summarizes information on the
region's freshwater resources. (Id. ¶ 12.) A USFS scientist
wrote the third report, summarizing the region's soil conditions.
(Id. ¶ 13.) The fourth document reports on terrestrial animal
species in the region, and was written by a scientist at a
federal agency, a scientist unaffiliated with the federal
government and two graduate students. (Id. ¶ 14.) The fifth
document, authored by two scientists unaffiliated with the
federal government, reports on the historic and prehistoric
vegetative conditions of the region. (Id. ¶ 15.) The sixth
document is a draft of a sub-chapter on native tree diseases
written by a USFS scientist. (Id. ¶ 16.) Each of these
requested documents is in draft form and the USFS does not
consider them final documents. (Id. ¶ 11-16.)

-5-

The draft reports of the HSEAC eventually became a final publication, "The Hoosier Shawnee Ecological Assessment." (Pls.' Mot. to Expedite, Ex. A.)  The final assessment notes that the "information presented provides a context for land and resource management planning on the Hoosier and Shawnee National Forests," but that "the assessment makes no management decisions or recommendations."[1]  (Id., Ex. A at 3, 5.)  This report, a "scientific assessment of the characteristic composition, structure, and processes of ecosystems in the southern one-third of Illinois and Indiana and a small part of western Kentucky[,] . . . focuses on information most likely to be relevant to land management planning on the Hoosier and Shawnee National Forests." (Id., Ex. A at 8.)  The USFS will use this final report to develop its Forest Plans and an Environmental Impact Statement for the Hoosier and Shawnee Forests.  (Def.'s Summ. J. Mot., Reynolds Decl. ¶ 13.)

The USFS denied plaintiffs' FOIA request on the grounds that the analyses in their draft form constituted protected material under the deliberative process privilege of the FOIA's Exemption

---

[1]   The report repeats that although "[r]egional assessments provide valuable information for land management planning and may discuss consequences of various management actions . . . they make no land management decisions or even recommendations" (Pls.' Mot. to Expedite, Ex. A at 8), and that the report "does not make management decisions or even management recommendations, nor does it provide any formal analyses of possible management actions." (Id., Ex. A at 9.)

-6-

5.[2]  (Def.'s Summ. J. Mot. at 2.)  Plaintiffs appealed the USFS's
decision, but were denied again based on Exemption 5 of the FOIA.
Heartwood[3] then filed this action, and the parties filed cross-
motions for summary judgment.

## DISCUSSION

Summary judgment is proper "if the pleadings, depositions,
answers to interrogatories, and admissions on file, together with
the affidavits, if any, show that there is no genuine issue as to
any material fact and that the moving party is entitled to a
judgment as a matter of law."  Fed. R. Civ. P. 56(c); see
Waterhouse v. District of Columbia, 298 F.3d 989, 991 (D.C. Cir.
2002).  The record must be viewed in the light most favorable to
the nonmoving party.  See Waterhouse, 298 F.3d at 991.

I.   FEDERAL ADVISORY COMMITTEE ACT

Congress passed the FACA in part to ensure that the public
could remain apprised of the existence, activities and cost of
advisory committees.  See Public Citizen v. Dep't of Justice, 491
U.S. 440, 446 (1989) (citing 5 U.S.C. app. II § 2(b) (2000)).
Enacted in 1972 as a response to the numerous committees, boards,

---

[2]   Exemption 5 of the FOIA allows agencies to withhold
deliberative process materials from production under a FOIA
request.  5 U.S.C. § 552(b)(5) (2000).

[3]   The complaint names Heartwood, Inc. and Donham as
plaintiffs.  For ease of reference, the plaintiffs will be
referred to as Heartwood.

commissions and other groups that had been established to advise

officers and agencies in the executive branch of the federal

government, one goal of the Act was to prevent wasteful

expenditure of public funds.  See Public Citizen, 491 U.S.

at 453.  Additionally, Congress sought to counter the fear that

committees would be dominated by representatives of industry and

other special interest groups seeking to advance their own

agendas.  See Cummock v. Gore, 180 F.3d 282, 284 (D.C. Cir. 1999)

(citing H.R. Rep. No. 92-1017 (1972)).

The FACA provides, in part, that:

Subject to [the FOIA], the records, reports, transcripts,
minutes, appendixes, working papers, drafts, studies,
agenda, or other documents which were made available to or
prepared for or by each advisory committee shall be
available for public inspection and copying at a single
location in the offices of the advisory committee or the
agency to which the advisory committee reports until the
advisory committee ceases to exist.

5 U.S.C. app. II § 10(b).  Under the FACA, advisory committees

must also "file a charter; announce their upcoming meetings in

the Federal Register; hold their meetings in public; and keep

detailed minutes of each meeting."  In re Cheney, 406 F.3d 723,

727 (D.C. Cir. 2005) (citing 5 U.S.C. app. II § 9(c);

§§ 10(a)(1), (2), (b) & (c); § 11).  Finally, the "committee must

'be fairly balanced in terms of the points of view represented'

and may 'not be inappropriately influenced by the appointing

-8-

authority or by any special interest.'"  Id. (quoting 5 U.S.C.
app. II §§ 5(b)(2), (3) & (c)).

The FACA defines an advisory committee as "any committee,
board, commission, council, conference, panel, task force, or
other similar group, or any subcommittee or other subgroup
thereof . . . which is . . . established or utilized by one or
more agencies in the interest of obtaining advice or
recommendations for the President or one or more agencies or
officers of the Federal Government."  5 U.S.C. app. II § 3(2).

The Supreme Court has given a narrow interpretation to the
words "established" and "utilized."  An advisory panel is
established when it has been formed by a government agency, and
utilized if it is "amenable to . . .  strict management by agency
officials."  Public Citizen, 491 U.S. at 457-58; see also Food
Chemical News v. Young, 900 F.2d 328, 332-33 (D.C. Cir. 1990)
(finding that a committee is "established" when it is "a
government formed advisory committee").  In Food Chemical News,
the court found that a panel advising the Federation of American
Societies for Experimental Biologies, which in turn advised the
Food and Drug Administration on food safety, was not an advisory
committee subject to the FACA because the panel was neither
established by the FDA nor "amenable to [any] management by [FDA]
officials."  Id. at 333 (quoting Public Citizen, 491 U.S. at 457-

-9-

458); see also Byrd v. Envtl. Prot. Agency, 174 F.3d 239, 246
(D.C. Cir. 1999) (finding that a committee providing
recommendations to the Eastern Research Group which had
contracted to provide recommendations to the Environmental
Protection Agency, was not established by the EPA and therefore
not an advisory committee subject to the FACA, even though the
EPA conceived of the need for the committee).

    Unlike the committees in Public Citizen, Food Chemical News
and Byrd, which the federal agencies did not directly convene but
were aided by, the USFS formed the HSEAC.  (Pls.' Summ. J. Mot.,
Ex. A.)  The USFS identified the members of the team, contracted
directly with them for their services, paid them, and provided
them with initial questions to answer.  (Id.)  The USFS
established the committee within the meaning of the FACA.

    Advisory panels that support decision makers with data, and
not policy advice or recommendations, can be considered advisory
committees under the FACA.  See Northwest Forest Res. Council v.
Espy, 846 F. Supp. 1009, 1013 (D.D.C. 1994) (citing Public
Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for
Foods, 886 F.2d 419 (D.C. Cir. 1989) (applying the FACA to a
committee established by the Secretary of Agriculture which
provided to the Secretaries of Agriculture and Health and Human
Services primarily scientific and technical advice on developing

-10-

microbiological criteria for food safety)).  When a committee is
established to provide expert summaries or interpretation of
technical data, their reports can be "in the interest of
obtaining advice or recommendations for . . . one or more
agencies."  5 U.S.C. app. II § 3(2);  see also Cal. Forestry
Ass'n v. U.S. Forestry Serv., 102 F.3d 609, 610-11 (D.C. Cir.
1996) (addressing the issue of whether the committee was subject
to the FACA if the report was intended primarily for Congress,
and only subsequently used by the agency).  In California
Forestry Association, the D.C. Circuit found that a committee
established by the USFS to create a scientific review of the
remaining old growth of the Sierra Nevada national forests was
subject to the FACA's requirements, noting that the factual
review is "an essential element of the Forest Service's long-term
plan for ecosystem management" and that it was being used to
draft an environmental impact statement.  Id. at 611-12.  Nothing
supports the assertion that the "FACA should not apply to
'advisory committees' consisting only of technicians who supply
the decisions-makers with data."  Northwest Forest Res. Council
v. Espy, 846 F. Supp. 1009, 1013 (D.D.C. 1994) (noting that the
committee at issue did render policy advice to the President, but
not finding that fact dispositive when holding that the committee
was subject to the FACA's requirements).

-11-

The USFS expressly asked the HSEAC not to provide any recommendations in their draft reports, and the final publication emphasizes that it "makes no management decisions or recommendations."  (Pls.' Mot. to Expedite, Ex. A at 5.)  The final assessment does "provide[] a context for land and resource management planning on the Hoosier and Shawnee National Forests." (Id. at 3.)  Even though HSEAC provided the USFS with only narrative summaries of scientific information, and made no policy recommendations, the HSEAC drafts and the final assessment provide the framework, context and information that the USFS will rely on in making policy decisions.  The USFS is required to revise the Forest Plans for the Shawnee and Hoosier Forests, which "establishes the management policies and practices," and submit an environmental impact statement.  (Def.'s Summ. J. Mot., Reynolds Decl. ¶ 3.)  The USFS initiated the ecological assessment "[i]n order to develop the future Forest Plans and draft [environmental impact statement] for the Hoosier and Shawnee."  (Id. ¶ 5, 6; see also Pls.' Mot. to Expedite, Ex. A at 8 (stating that the USFS will use the ecological assessment to inform, modify, and develop its forests plans, and to create an environmental impact statement).)  Because the USFS has contemplated that the final ecological assessment would play a leading role in developing the forest plan for the Hoosier and

-12-

Shawnee Forests, the HSEAC provided information "in the interest of obtaining advice or recommendations for . . . one or more agencies" and is subject to the FACA's requirements.  5 U.S.C. app. II § 3(2).

The HSEAC also is not exempted from the FACA under the exceptions provided in the Code of Federal Regulations. Committees excepted from the FACA requirements include:

> (e) Groups assembled to provide individual advice.  Any group that meets with a Federal official(s), including a public meeting, where advice is sought from the attendees on an individual basis and not from the group as a whole; [and]
>
> (f) Groups assembled to exchange facts or information. Any group that meets with a Federal official(s) for the purpose of exchanging facts or information;

41 C.F.R. § 102-3.40(e), (f) (2005).

Although the scientists and parties involved in HSEAC drafted their summaries in sub-groups or individually, and not as one large group, the USFS considered the scientists working on HSEAC to be a team.  (See, e.g., Pls.' Summ. J. Mot., Ex. A at 2-3 (referring to the HSEAC as a "team").)  The HSEAC met twice as a group to discuss the existing data available and to outline the report.  (Def.'s Summ. J. Mot., Reynolds Decl. ¶ 8.)  The HSEAC was assembled for the single purpose of drafting the ecological assessment to inform the USFS's policy-making.  See, e.g., Nader v. Baroody, 396 F. Supp. 1231, 1234 (D.D.C. 1975) (holding that the purpose and "narrow focus" of a committee is a factor in

-13-

evaluating whether a group is an advisory committee within the meaning of the FACA).  The HSEAC is not the type of ad hoc, individualized group that 41 C.F.R. § 102-3.40(e) was designed to exempt from the FACA.

The HSEAC also is not a group that was assembled to *exchange* facts or information.  If the President or an agency seeks to "provide[] a mechanism and sounding board to test the pulse of the country by conferring directly or indirectly with a widely disparate special interest groups" and encourage an "exchange of views," the resulting meetings are not subjected to the requirements of the FACA.  Nader, 396 F. Supp. at 1232, 1234. HSEAC, however, did not involve the exchange of information between the USFS and the outside scientists.  Rather, the scientists provided the USFS with the narrative summaries in a one-way transfer of information.  (See Pls.' Summ. J. Mot., Ex. A at 1-2.)  Nothing suggests that the HSEAC functioned to "increase the flow of information between" private groups and the executive branch like the informal meetings that 41 C.F.R. § 102-3.40(f) exempts from the FACA.

Because the HSEAC is an advisory committee within the meaning of the FACA, the USFS must release the draft reports Heartwood requested, unless the drafts are otherwise protected by the FOIA.

-14-

II.  FREEDOM OF INFORMATION ACT

        The FACA requires disclosure of an advisory committee's
records "subject to section 552 of title 5 of the United States
Code."  5 U.S.C. app. II § 10(b).  All materials prepared by an
advisory committee under the FACA must be available to the public
unless they are exempt from the FOIA.  Food Chemical News v.
Dep't of Health & Human Servs., 980 F.2d 1468, 1469 (D.C. Cir.
1992).  Exemption 5 of the FOIA provides that an agency is not
required to disclose "inter-agency or intra-agency memorandums or
letters" concerning its deliberative process.  5 U.S.C.
§ 552(b)(5).[4]  This exemption is not available to documents
revealing an advisory committee's deliberative process because
the exemption applies only to agencies.  Wolfe v. Weinberger, 403
F. Supp. 238, 242 (D.D.C. 1975).  "[A]n advisory committee cannot
have a 'double identity' as an agency and thus cannot invoke
[Exemption 5]."  Id.; see also Gates v. Schlesinger, 366 F. Supp.
797 (D.D.C. 1973).[5]  To make Exemption 5 available to an advisory

_____

[4]    The statute excludes "inter-agency or intra-agency
memorandums or letters which would not be available by law to a
party other than an agency in litigation with the agency."  5
U.S.C. § 552(b)(5).  This includes documents protected by the
attorney-client privilege, work-product privilege and the
executive deliberative process privilege.  See Envtl. Prot.
Agency v. Mink, 410 U.S. 73, 86-87 (1973), superceded on other
grounds by Pub. L. No. 93-502.
[5]    Gates found significant that the FACA contains separate
definitions of an "advisory committee" and "agency," thus
supporting the proposition that an advisory committee is not an
agency.  Gates, 366 F. Supp. at 798-99.

-15-

committee "would be in clear contravention of the purpose of the
[FACA]." Wolfe, 403 F. Supp. at 242-43 (noting also that "to
allow the [advisory committee] to avail itself of the (b)(5)
exemption . . . would be tantamount to burying the type of
deliberations which the [FACA] sought to bring to the light of
day").

Documents produced by an advisory committee that are "relied
upon by the *agency* in the course of decision-making," however,
could be considered an integral part of the deliberative process
and entitled to protection under Exemption 5.  Id. at 243[6]
(emphasis added).  Information qualifies for Exemption 5's
privilege if the information is predecisional and deliberative.
Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 39 (D.C.
Cir. 2002).  The purpose of this exemption is to "protect[] the
consultative functions of government by maintaining the
confidentiality of advisory opinions, recommendations, and
deliberations comprising part of a process by which governmental
decisions and policies are formulated."  Jordan v. Dep't of
Justice, 591 F.2d 753, 772 (D.C. Cir. 1978) (internal quotation
marks omitted), overruled in part on other grounds, Crooker v.

---

[6]     Exempt agency documents that the advisory committee used in
its own deliberations would also continue to receive the
protection of the FOIA exception.  Wolfe, 403 F. Supp. at 243.

-16-

Bureau of Alcohol, Tobacco & Firearms, 670 F.2d 1051 (D.C. Cir.
1981).

A document is considered "deliberative" when "it reflects
the give-and-take of the consultative process." Coastal States
Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980).
The exception is designed to shield the "process by which
governmental decisions and policies are formulated." Petroleum
Info. Corp. v. Dep't of the Interior, 976 F.2d 1429, 1433 (D.C.
Cir. 1992). Documents that "reflect the personal opinions of the
writer rather than the policy of the agency" or that "would
inaccurately reflect or prematurely disclose the views of the
agency," are considered deliberative. Coastal States Gas Corp.,
617 F.2d at 866. The key inquiry is whether disclosure is likely
"to stifle honest and frank communication within the agency"; if
so, the information is protected. Id.

"As a general proposition Exemption 5 does not shield from
disclosure 'purely factual, investigative matters,' as opposed to
'materials reflecting deliberative or policy-making processes.'"
Washington Research Project, Inc. v. Dep't of Health, Ed. &
Welfare, 504 F.2d 238, 249 (D.C. Cir. 1974). However, "in some
instances, 'the disclosure of even purely factual material may so
expose the deliberative process within an agency' that the
material is appropriately held privileged." Petroleum Info.

-17-

Corp., 976 F.2d at 1434 (quoting Mead Data Central, Inc. v. Dep't of Air Force, 566 F.2d 242, 256 (D.C. Cir. 1977)).  Factual material may also be exempt "if it is inextricable without compromise of the deliberative process . . . even though the facts themselves are elsewhere on the public record."  Washington Research Project, Inc., 504 F.2d at 249.  A document containing "opinions or recommendations regarding facts" that also reveals "the decision-making process itself" would be protected from disclosure under Exemption 5.  Nat'l Wildlife Federation v. USFS, 861 F.2d 1114, 1118 (9th Cir. 1988) (holding that draft forest plans and draft environmental impact statements were protected from disclosure under Exemption 5).

The drafts here are not deliberative because nothing in the drafts "reflects an agency's preliminary positions or ruminations about a particular policy judgment."  Nat'l Assoc. of Home Builders, 309 F.3d at 39 (internal quotation marks omitted).[7] Although the USFS argues that the drafts are deliberative because they "convey opinions and offer conclusions and methodology for [the] USFS to embrace or reject" (Def.'s Summ. J. Mot. at 7), the record evidence shows that the USFS believed the drafts of the ecological assessment and the ecological assessment itself

_____

[7]    Because the drafts do not qualify as deliberative documents, the court need not decide whether the drafts of the ecological assessment are predecisional.

contain no recommendations or policy judgments and should be treated as purely factual documents. (See Pls.' Mot. to Expedite, Ex. A. at 5, 8, & 9.) Unlike the release of the draft forest plans at issue in National Wildlife Federation, the release of the HSEAC draft reports would not reveal "the Forest Service's judgment as to the appropriate balance to strike among the conflicting demands placed on the Forest's finite resources." Nat'l Wildlife Federation, 861 F.2d at 1120. The HSEAC was explicitly admonished not to include recommendations or opinions in the draft reports of the ecological assessment. (See Def.'s Summ. J. Mot., Reynolds Decl. ¶ 8.) Additionally, the drafts sent to the USFS employees can be disclosed without revealing any agency comments. To the extent that the comparison between the drafts and the final assessment would reveal any changes to the drafts the USFS employees' made, the release of the HSEAC drafts would not reveal the agency's deliberative process because the purpose of the agency's review - - to produce the ecological assessment - - did not culminate in a policy decision, and thus could not reveal any process by which such decisions are made. See Nat'l Wildlife Federation, 861 F.2d at 1118 (noting that a "document is considered part of the 'deliberative process' as long as it is 'actually . . . related to the *process* by which policies are formulated" (emphasis in original)). Finally,

-19-

because the drafts consist only of factual narratives and
summaries provided by a non-agency group to the USFS of material
already available to the public, the release of the drafts will
not chill the "frank and honest communication within the agency."
Coastal States Gas Corp., 617 F.2d at 866.[8]  Therefore, the HSEAC
draft reports are not protected by the FOIA and they must be
released to the public under the FACA.

### CONCLUSION

Because the HSEAC is an advisory committee under the FACA
and because the draft reports are not exempt under Exemption 5 of
the FOIA, plaintiffs' cross-motion for summary judgment will be
granted, and defendant's motion for summary judgment will be
denied.  A separate order accompanies this memorandum opinion.

SIGNED this 20th day of April, 2006.


_____/s/_____
RICHARD W. ROBERTS
United States District Judge

---

[8]     The USFS cites Cummock to support its proposition that the
FACA does not supercede the FOIA.  The facts in Cummock, however,
are inapposite as Cummock stated that disclosure under the FACA
is required unless the agency has a valid claim under the FOIA.
Cummock, 180 F.3d at 289-90.